**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**CONTINENTAL CASUALTY COMPANY and**
**TRANSPORTATION INSURANCE COMPANY,**
      **Plaintiffs**
**vs.**

**CITY OF JACKSONVILLE, DUVAL COUNTY**
**SCHOOL BOARD and JACKSONVILLE**
**ELECTRIC AUTHORITY,**
      **Defendants**

**CASE NO. 3:04-CV-1170-HES-MCR**

**DUVAL COUNTY SCHOOL BOARD,**
      **Counter-Plaintiff**
**vs.**

**INSURANCE COMPANY OF NORTH AMERICA**
      **Counter-Defendant.**
                            /

## O R D E R

This cause comes before this Court upon consideration of Counter-Plaintiff Duval County School Board's ("DCSB") Supplemental Complaint seeking Declaratory Relief (Doc. No. 161, p. 34-36; filed January 23, 2006), Counter-Defendant Century Indemnity Company's (Successor to Insurance Company of North America, "Century") Motion for Summary Judgment Based on the Pollution Exclusion (Doc. No. 490; filed November 7, 2008), and Memorandum of Law in Support thereof (Doc. No. 491; filed November 7, 2008), DCSB's Memorandum of Law in Opposition to Century's Motion for Summary Judgment (Doc. No. 503; filed December 5, 2008), and Century's Reply in Further Support of the Motion. (Doc. No. 515; filed December 30, 2008). Century additionally submitted a Separate Statement of Facts in support of its Motion (Doc. No.

493, filed November 7, 2008) and DCSB responded in its Response to Century's Separate Statement of Facts (Doc. No. 506; filed December 5, 2008). The issue before this Court is whether there is a genuine issue of material fact as to whether Century breached its contractual responsibility to defend and indemnify DCSB in the underlying *Williams* lawsuit.

## I. Background

This issue is a small part of a large and contentious litigation spanning over a number of years. All claims asserted in this case, except for those at bar, have been settled. For the sake of brevity, this Court will only address the background information necessary for deciding whether summary judgment is appropriate as requested by Century's instant motion.

In May 2003, DCSB was sued in *Nora Williams, et al. v. City of Jacksonville, et al.,* ("*Williams*") n Duval County Circuit Court. (Doc. No. 492, Exhibit B). In the lawsuit, Ms. Williams and thousands of Jacksonville, Florida residents filed a class action against the City of Jacksonville, Jacksonville Electric Authority (JEA), Waste Management Inc. of Florida, Waste Management Holdings, Inc., and DCSB. *Id.* The action alleged, *inter alia*, damage to real property, and physical and emotional injuries caused by excessive exposure to elevated levels of toxic heavy metals such as lead, mercury, arsenic, dioxin and furnas, carcinogenic polycyclic aromatic hydrocarbons (PAHs), hazardous polycholorinated biphenyls (PCBs), and other toxic contaminants. *Id.*, at pg. 9, ¶25. The Plaintiffs asserted that the damage was directly and proximately caused by the contamination of municipal incinerator ash sites. *Id.* at pg. 12. *Williams* involved a number of dump sites, but DCSB's alleged liability and claim for coverage was limited to Brown's Dump Site ("Site").

The *Williams* Fourth Amended Complaint ("Complaint") alleged DCSB owned portions

2

of Brown's Dump Site, a former garbage dump that received municipal incinerator ash and

municipal solid waste from the City of Jacksonville between the late 1940's and the 1960's. In

1955, DCSB acquired approximately 14 acres of the Site, and, in 1957, it constructed Mary

Macleod Bethune Elementary School. The school has since closed. *Id.* at pg. 7, ¶18. Residential

housing was also developed around the Site at various times, and most properties in this area

have elevated concentrations of toxic chemicals and deposits of incinerator ash. *Id.* at pg. 10,

¶27. The Site is now on the National Priorities List under the Comprehensive Environmental

Response and Compensation Liability Act. *Id.* at pg. 5, ¶11.

The Complaint alleges DCSB was negligent:

a. In purchasing contaminated property and in constructing public schools on such property; Defendant School Board knew or should have known that the properties contained large amounts of municipal incinerator ash, that such ash contained excessive levels of extremely toxic chemicals, and that the construction of a public school would result in exposure to the students, teachers and employees to excessive levels of the toxic chemicals;

b. In allowing children in the public schools to play in contaminated areas of the school properties; Defendant School Board knew or should have known that the toxic contaminants in the dirt on the properties, such as lead, created an unreasonable risk of injury, particularly to small children;

c. In failing to close properties and prevent further access to the contaminated areas when it discovered the nature and extent of the contamination;

d. In failing to warn parents and guardians of the children attending such schools of the contamination and the necessity of preventing exposure to the children; and

E. In allowing toxic chemicals to migrate from its property into the adjacent residential community.

*Id.* at p. 28, ¶66. Additionally, the *Williams* Plaintiffs, in Counts V and VI of the Complaint,

asserted claims for private nuisance and trespass against the Defendants, including DCSB. *Id.* at

¶74-83. The underlying *Williams* lawsuit has settled and, as a result, all discovery related to the litigation has ended.

Century's predecessor, Insurance Company of North America ("INA") issued "Comprehensive General Insurance" Policy No. GLP 39 99 85 3 to DCSB ("Policy") (Doc. No. 492, Exhibit A). The Policy promises to defend and indemnify DCSB from and against third party claims, subject to the terms of the Policy and the laws of the State of Florida, from October 1, 1985 until October 4, 1986. *Id.* At the outset of the *Williams* lawsuit, DCSB was unaware of the Policy's existence (Doc. No. 161, pg. 25, ¶32). Further, the interrogatories issued by Century reveal that DCSB did not possess the original copy of the Policy, and has not been able to locate it within its records (Doc. No. 491, Exhibit 2, Response to Request Nos. 1 and 2). All documents concerning the original Policy have been lost or destroyed by DCSB. *Id.*, Response to Request No. 6. However, Century was able to locate a copy and produced it to DCSB in October 2004, in response to a subpoena issued by the City in June 2004 (Doc. No. 503, pg. 4). It is excerpts from this copy of the Policy that appear below.

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
>
> A.  bodily injury
> B.  property damage
>
> to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obliged to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

(Doc. No. 493, ¶4). However, the Policy also includes a section on exclusions, including the following qualified exclusion:

> This insurance does not apply:
>
> (f)     to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke; vapors, soot, fumes, acids, akalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

*Id.* at ¶5.

According to DCSB, it provided notice to INA and demanded that it defend and/or indemnify DCSB in the litigation on October 28, 2004, and requested it advise DCSB whether it would do so (Doc. No. 503, pg. 25, ¶34). According to DCSB, INA initially indicated it would defend DCSB, but quickly changed its mind. *Id.* at p. 26, ¶36. In December 2004, Century refused to defend DCSB in the *Williams* litigation, declined to participate in settlement discussions, and, in September 2005, denied coverage for the settlement DCSB entered into with the *Williams* Plaintiffs (Doc. No. 503, pg. 2). On January 23, 2006, in its Supplemental Complaint for Declaratory Relief against INA, DCSB, asserted a Counterclaim for Declaratory Relief against INA over the scope of INA's obligations to provide defense and coverage for DCSB (Count VI) and its responsibility to indemnify DCSB in relation to the *Williams* litigation (Count V) (Doc. No. 161, pgs. 34-36*)*.

Century asks this Court to declare that it has no duty to defend or indemnify DCSB for the *Williams* lawsuit due to its Policy's pollution exclusion. In response, DCSB argues (1) the pollution exclusion is not applicable when DCSB did not cause the pollution; (2) even if the

5

pollution exclusion is implicated, it does not apply because the claims against DCSB did not arise from the discharge of pollutants; (3) that Century had a duty to defend DCSB under Florida's Concurrent Cause Doctrine; (4) there are genuine issues of material fact as to whether Century is entitled to invoke the qualified pollution exclusion because of the doctrine of regulatory estoppel; (5) the claims were partially covered by the "Personal Injury Endorsement." *See* Doc. No. 503. The Court will address each of these arguments in turn.

## II. Analysis

### A. Standard of Review

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed. R. Civ. P. 56. Furthermore, where the essential facts of the case are not in dispute, it is appropriate for a district court to interpret an insurance contract to determine whether any ambiguities exist as a matter of law. *Gulf Tampa Drydock Co. v. Atlantic Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985).

The movant, Century, bears the initial responsibility of showing an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate '*specific facts* showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added). A material fact is one "that might affect the outcome of the suit under governing law," and a dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury

6

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, conclusory allegations, unsupported by specific evidence, will be insufficient to establish a genuine issue of material fact to defeat a motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

## B. Choice of Law

This Court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1332, as complete diversity exists between the parties and the amount in controversy has been met. In diversity actions, this Court must apply the substantive law of the state in which it sits, "except in matters governed by the Federal Constitution or by acts of Congress." *Erie Railroad v. Tompkins*, 304 U.S. 64, 78 (1938). The parties do not dispute that Florida law governs the disposition of this case.

## C. Discussion

In Florida, it is well settled that an insurer's duty to defend is determined by the allegations in the complaint. If the complaint alleges facts that fairly and potentially bring the suit within the policy's coverage, an insurer has a duty to defend its insured against legal action. *Hartford Accident & Indem. Co. v. Beaver*, 466 F.3d 1289, 1292 (11th Cir. 2006) (quoting *Jones v. Florida Ins. Guar. Ass'n*, 908 So. 2d 43, 442-43 (Fla. 2005)); *see also Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So. 2d 533, 536 (Fla. 1977) (noting the insurer is under a duty to defend a suit against an insured only where the complaint alleges facts within the coverage of the policy); *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008) (citing *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1332 (S.D. Fla. 2006)) ("The duty to defend depends solely on the facts and legal theories alleged in the pleadings and claims against

the insured.").

The Florida Supreme Court has made clear that insurance contracts must be construed according to the plain language of the policy. *Taurus Holdings, Inc. v. United States Fid. and Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Further, "if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous." *Auto-Owners Ins. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (citing *Weldon v. All Am. Life Ins. Co.*, 605 So. 2d 911, 914-15 (Fla. 2d DCA 1992) and *Container Corp. Of Am. v. Maryland Cas. Co.*, 707 So. 2d 733, 736 (Fla. 1998)). Ambiguous policy provisions are interpreted liberally in favor of coverage of insured and against the drafter. *Deni Assocs. of Fla. v. State Farm Fire & Cas. Inc. Co.*, 711 So. 2d 1135, 1140 (Fla. 1988). Likewise, ambiguous exclusionary clauses must be construed in favor of the insured and are construed more strictly than coverage classes. *Id.* at 1138.

However, these rules of construction only operate when "a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction . . . . It does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)); *see Taurus*, 913 So. 2d at 532 (noting that "although ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous"). Furthermore, just because it is necessary for a court to interpret a contract, it does not follow that the contract is ambiguous. The failure to define a term does not create ambiguity per se. *West Am. Ins. Co., v. Band & Desenberg*, 925 F. Supp. 758, 760 (M.D. Fla. 1996) (citing *Gulf Tampa Drydock Co.*, 757 F.2d at

8

1174).

DCSB claims the specific language of the pollution exclusion is ambiguous as it "does not clearly and unambiguously apply to a policyholder who did not cause the pollution" and therefore should be construed in favor of DCSB. (Doc. 503, p. 9). However, this Court finds that no ambiguity exists in Century's pollution exclusion clause. Therefore, the rules governing the construction of ambiguous insurance contracts need not be employed by this Court. The exclusion at issue applies to "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids . . ." (Doc. No. 493, ¶5). The phrase, "arising out of" is not ambiguous and should be interpreted broadly. *James River Ins. Co.*, 540 F.3d at 1275 (quoting *Taurus*, 913 So. 2d at 539). "'[A]rising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' growing out of,' 'flowing from,' 'incident to' or 'having connection with' . . . there must be 'some causal connection, or relationship' that is 'more than a mere coincidence' but proximate cause is not required." *Id.*

**(1) The Pollution Exclusion and Non-polluters**

Century's pollution exclusion casts a wide net, excluding coverage for property damage or bodily injury arising out of the discharge of pollution, not just the discharge of pollution by the insured. The Policy makes no coverage distinction regarding active and inactive polluters, and, under Florida law, this Court may not imply such a distinction. It would be contrary to Florida policy to read such a qualification into the plain language of the policy where none existed before. *See Deni Assocs. of Fla.*, 711 So. 2d at 1135.

The *Williams* Plaintiffs' allegations of negligence and claims for damages against DCSB

arise directly out of the pollution at the Site. However, the question as to whether DCSB's conduct was indeed negligent depends on DCSB's response to and recognition of environmental pollution. *James River Ins. Co.*, 540 F.3d at 1275 (noting that although the defendant was negligent in performing an assessment of a contaminated site, the plaintiff's claims for damage depended upon the existence of environmental contamination). Furthermore, the Policy excludes coverage for bodily injury or property damage *caused by* pollution, not necessarily the *act of* polluting. Therefore, this Court finds that it was the intent of the parties that the exclusion apply broadly to bodily injuries and property damage caused by pollution, unless that release is sudden and accidental.

The case of *Dimmitt Chevrolet v. Southeastern Fid. Ins. Corp.*, is particularly instructive. 636 So. 2d 700 (Fla. 1993). In *Dimmitt*, two automobile dealerships sold oil generated by its company to a third party, Peak, who then recycled the oil at its plant. Plant operations resulted in groundwater pollution on around the site. The Environmental Protection Agency ("EPA") determined that the contamination was caused by Peak's placement of oil sludge into unlined storage ponds, its spills and leaks, and a dike collapse. The dealerships entered into two administrative orders with the EPA and, without conceding liability, agreed to undertake remedial measures at the Peak site. The dealerships' insurer sought a declaratory judgment that it owned no duty to defend or indemnify because the claims fell within the ambit of the pollution exclusion. The Florida Supreme Court held that the exclusion barred coverage, even though the dealership was not the actual cause of the pollution damage.[1] In reaching its conclusion, the

---

[1] This Court recognizes that the primary issue in *Dimmitt* was not whether a non-polluting insured could be held liable, but rather whether the pollution was sudden and accidental.

Court endorsed the possibility that a qualified pollution exclusion can be applicable when the policyholder did not cause the pollution, "Dimmitt was not the actual cause of the pollution at issue. Its liability, however, is not in dispute in this case." *Dimmitt*, 636 So. 2d at 702. *See also* J. Grimes, concurring:

> I . . . perhaps subconsciously [relied] upon the social premise that I would rather have insurance companies cover these losses rather than parties such as *Dimmitt* who did not actually cause the pollution damage. In doing so [however], I departed from the basic rule of interpretation that language should be given its plain and ordinary meaning.

*Id.* at 706.

Furthermore, the Eleventh Circuit in *James River* found coverage was barred by the pollution exclusion even though the defendants had in "no way caused the pollution." *James River Ins. Co.*, 540 F.3d at 1276. DCSB seeks to distinguish the instant case from *James River* as, in *James River*, an "absolute" pollution exclusion clause was at issue, whereas here the pollution exclusion clause is "qualified." However, the "absolute" nature of the exclusion in *James River* does not remove its application to the instant case. The policy in *James River* excluded coverage for:

> [a]ll liability and expense *arising out of or related to* any form of pollution, whether intentional or otherwise," and does not cover "any damages, claim, or suit arising out of the actual, alleged or threatened discharge, dispersal, seepage migration, release or escape of pollutants," including: "any loss, cost, expense . . . arising out of insured, or others, test for, monitor . . . or in any way respond to, or assess same, the effects of pollutants, environmental impairments or contaminants . . . .

*Id.* at 1273 (emphasis added). While DCSB's distinction is facially correct, it is a distinction without a difference. The fact that the exclusion at issue was "absolute" did not serve as a substantive basis for the Eleventh Circuit's decision denying coverage. The insurance company

11

contended that the defendant's claim arose out of pollution that was covered by the pollution exclusion. Therefore, the Eleventh Circuit focused much of its decision on the "arising out of" language of the pollution exclusion, and not the "related to" part of the provision, which, as DCSB notes, is absent from the Century Policy. "To determine whether the claims brought by Priority arose out of pollution such that they are covered by the exclusion, we therefore look to the allegations in [the] complaint . . . in the underlying litigation." *Id.* at 1275. At no point does the Eleventh Circuit discuss the effects of the phrase "related to" to any of the defendant's contractual obligations. Additionally ,"[v]arious courts have read pollution exclusions to exclude coverage for claims against insured who were not themselves the polluters . . . . [W]e are bound by the plain language of the policy . . . ." *Id.* at 1276.

Additionally, the Eleventh Circuit cites two other cases, *Northern Ins. Co. v. Aardvark Associates*, 942 F. 2d 189 (3d Cir. 1993) and *United States Fid. & Guar. Co. v. Korman Corp.*, 693 F. Supp. 253 (E.D. Pa. 1988), in support of its holding that the pollution exclusion can bar coverage, even in circumstances where the insured did not cause the pollution, "[t]he clause unambiguously withholds coverage for injury or damage 'arising out of the discharge, dispersal, release or escape' of pollutants, not merely the insured's discharge, dispersal, release or escape of pollutants.'" *Northern Ins. Co. v. Aardvark Associates*, 942 F. 2d at 194. The Third Circuit further noted that the exclusion does not differentiate between "active polluters or passive polluters," as "[t]he terms are foreign to the policies in question." *Id.* at 194 (quoting *Fed. Ins. Co. v. Susquehanna Broad. Co.*, 727 F. Supp. 169, 177 (M.D. Pa. 1989)).

Moreover, in *Korman Corp.*, a qualified pollution exclusion with identical language to the one at issue in the instant case was held to exclude coverage for a developer's failure to

disclose the proximity of a landfill to his housing development. The court found in favor of the insurer, finding that the alleged property damage fell within the ambit of the pollution exclusion, "because it allegedly arose out of the leaching of hazardous and toxic wastes and residue from solid wastes and from the giving off of 'noxious odors, gases and fumes.'" *Korman Corp.*, 693 F. Supp. at 259.

The application of the pollution exclusion to an insured non-polluter is hardly novel. *See, e.g., Park-Ohio Indus., Inc. and Rocco Inc., v. The Home Indemn. Co.*, 975 F.2d 1215, 1219 (6th Cir. 1992) ("The pollution exclusion places no limitation on how the discharge is to be made or by whom . . . . [T]here is nothing in the facts of this case which bring into question the meaning of the 'discharge' or who must make the discharge."); *Powers Chemco, Inc. v. Federal Ins. Co.*, 548 N.E.2d 1301 (N.Y. 1989) ("[T]here is nothing in the language of the pollution exclusion clause to suggest that it is not applicable when the liability is premised on the conduct of someone other than the insured."); *Quaker State Minit-Lube v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1531 (10th Cir. 1995) (noting that the plain language of the clause excludes coverage for bodily or property damage "arising from the discharge of pollutants," whether or not the insured caused the discharge); *Larsen Oil Co. v. Federated Serv. Ins. Co.*, 1995 U.S. App. LEXIS 36215 (9th Cir. 1995) (holding that because the pollution exclusion contains no qualification, it does not require that the insured be the one who discharges the pollutant); *St. Paul Fire & Marine Insurance Co. v. Warwick Dyeing Corp.*, 26 F. 3d 1195, 1202 (1st Cir. 1994) (noting nothing in the policy indicates the exclusion is limited to discharges by the insured). As DCSB fails to raise an issue of genuine fact as to the ambiguity of the pollution exclusion, summary judgment in favor of Century is appropriate.

13

**(2) Application of the Pollution Exclusion when the Party did not "discharge" Pollution**

DCSB additionally argues that Century had a duty to defend because the *Williams*
Complaint did not allege that DCSB was liable for the discharge, dispersal or release of the
contaminants. "The qualified pollution exclusion simply does not apply when the basis for the
claims is not the original discharge, but subsequent negligent and unrelated conduct." While this
contention is the practical equivalent to claiming the pollution exclusion is inapplicable to non-
polluters, which is discussed at length above, this Court will address DCSB's argument briefly.
The *Williams* Complaint need not literally allege DCSB discharged, dispersed or released gases
upon the land, as the exclusion reads: "This insurance does not apply: (f) To bodily injury or
property damage arising out of the discharge, dispersal, release or escape of . . . pollutants onto
the land." (Doc. No. 493, ¶5). Therefore, the plain and simple meaning of the exclusion is that
Century is not liable for bodily injury or damage that arose out of the discharge of pollutants.
DCSB attempts to shift focus away from this obvious reading by emphasizing the word
"discharge" instead of the phrase "arising out of." DCSB supports its argument with
*Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So, 2d 176 (Fla 4th DCA 1997). However, in
*Westmoreland*, the Court held that "arising out of" was ambiguous. *See Taurus*, 913 So. 2d at
532. This Court does not find "arising out of" ambiguous and therefore *Westmoreland* does not
control this Court's decision.[2]

---

[2] This distinction notwithstanding, this Court finds DCSB's decision to rest the crux of
their argument on *Westmoreland* must fail as it is no longer good law. *See, e.g., Taurus*, 913 So.
2d at 533 (noting because *Westmoreland* no longer stands for the proposition that the "arising out
of" language is ambiguous, the rest of the Courts reasoning fails in this instance); *Estate of
Bombolis v. Continental Casulaty Co.*, 740 So.2d 1229 (Fla 4th DCA 1999) (noting the phrase
"arising out of" is not prime facie ambiguous due to *Westmoreland* ); *Allstate Ins. Co., v. Safer*,
317 F. Supp 2d 1345 (M.D. Fla. 2004) ("[C]ourts outside of the Fourth District Court of Appeals

### (3) The Concurrent Case Doctrine

DCSB further argues Florida's Concurrent Cause Doctrine permits coverage under an insurance policy when the loss can be attributed to multiple causes, so long as one of the causes is an insured risk. *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1330 (11th Cir. 2005) (quoting *Am. Sur. & Cas. Co. v. Lake Jackson Pizza Inc.*, 788 So. 2d 1096, 1100 (Fla. 1st DCA 2001). DCSB argues that Century had a duty to defend it under Florida's Concurrent Cause Doctrine because the injuries and damage caused by DCSB's failure to warn and protect students were not subject to the pollution exclusion. However, under the plain reading of the Policy, anything "arising out of" pollution is excluded. Therefore, damage caused by the failure to warn about pollution also falls within the pollution exclusion.

### (4) The Sudden and Accidental Exception to the Pollution Exclusion

Once the pollution exclusion is found to apply, the burden shifts to DCSB to prove that the exception to Century's pollution exclusion, for "sudden and accidental" releases, is supported by the facts alleged in the *Williams* Complaint. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F. 3d 1511, 1516 (11th Cir. 1997). The Florida Supreme Court has held that the term "sudden and accidental" is not ambiguous, and is defined as immediate or abrupt, instead of gradual over a period of years. *Dimmitt*, 636 So. 2d at 703. DCSB does not argue that the pollution underlying the *Williams* Complaint was sudden and accidental. Rather DCSB urges this Court to find the qualified pollution exclusion unenforceable based on the doctrine of regulatory estoppel. (Doc. No. 503, p. 18). Specifically, DCSB contends that there are various issues of "material fact

---

have refused to follow that court's decision in *Westmoreland* . . . . This court agrees with majority Florida view that the exclusion is not ambiguous.").

relating to regulatory estoppel," and that it has not had the opportunity to conduct discovery on the issue, making a motion for summary judgment inappropriate at this stage of the litigation. *Id.*

DCSB's attempt to invoke regulatory estoppel fails from the outset. In response to a summary judgment motion, an opposing party may not rely "merely on allegations or denials in its own pleading;" rather, it must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Black's Law Dictionary defines "estoppel," in this context, as "a bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true." Black's Law Dictionary 570 (7th ed. 1999). This Court is unable to find Florida or Eleventh Circuit case law that recognizes "regulatory estoppel" as a bar to enforcing the pollution exclusion. However, even if this Court were able to find such support, DCSB fails to set out specific facts showing why estoppel should be invoked in *this* case. DCSB fails to show how Century made representations to DCSB, or any other party, that would give it the impression that the pollution exclusion would not bar coverage in this case. To this Court, it seems Century has refused to indemnify or defend DCSB from virtually the moment DCSB realized such an exclusion existed. DCSB alleges no specific facts or evidence as to why estoppel is applicable here.

Nor is judicial notice through "extensive public information" about the drafting history and the representations made by the insurance industry to state insurance commissions sufficiently alleged "facts" to overcome a summary judgment argument. (Doc. No. 515, p. 6). Allegations that the insurance industry at large is manipulating consumers amounts to nothing more than a conspiracy theory which has no proven applicability to this case. DCSB fails to meet its burden of presenting this Court with "specific facts showing a genuine issue for trial." Fed. R.

Civ. P. 56(e)(2). The absence of any allegations of sudden or accidental pollution in the underlying *Williams* Complaint brings the injuries and damage caused by the pollution outside the scope of coverage by the Century Policy.

## (5) Potential Personal Injury Coverage

DCSB argues, in the alternative, that even if the personal injuries alleged in the *Williams* Complaint are excluded from coverage, claims made by residential property owners in the *Williams* Complaint are covered by a separate part of the Policy, the Personal Injury Endorsement ("Endorsement"), to which the pollution exclusion does not apply. The Endorsement provides, in a separate clause, that Century will pay, on behalf of the insured, all sums which it shall become obligated to pay as damages because of personal injury. Under the Endorsement, Century has the duty to defend any suit against the insured that claims damages as a result of a personal injury. A "personal injury," as defined by the policy:

> means injury arising out of one or more of the following offenses committed during the policy period:
>
> 1. false arrest, detention, imprisonment or malicious prosecution
>
> 2. wrongful entry or eviction or other invasion of the right of private occupancy;
>
> 3. a publication or utterance
>
> > (a) of a libel or slander or other defamatory or disparaging material, or
> >
> > (b) in violation of an individual right of privacy, except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

(Doc. No. 492, Exhibit A, p. 13). Specifically, DCSB contends that *William's* Plaintiffs

allegations for inverse condemnation, trespass, and nuisance constitute injuries equivalent to

"wrongful entry or eviction or other invasion of the right of private occupancy of real property."

In Florida, "a court should construe each sentence in connection with the other provisions

of the policy to arrive at a reasonable construction that accomplishes the intended purposes of the

parties." *Int'l Ship Repair & Marine Servs. v. St. Paul Fire*, 944 F. Supp. 886 (M.D. Fla 1996)

(citing *Int'l Ins. Co. v. Johns*, 874 F. 2d 1447, 1456 (11th Cir. 1989). Furthermore, Courts should

not interpret any clause of a contract in a manner which destroys the meaning of any other

provision. *Id.* The Eleventh Circuit noted:

> [N]o clause should be interpreted in a manner which eviscerates any
> other provision. *Id.* at 485-86. The analysis urged by plaintiffs would
> result in precisely such a negation of the pollution exclusion contained
> in these policies. The type of environmental contamination present in this
> case would fall squarely within the coverage for property damage in this
> policy were it not expressly excepted by the pollution exclusion.
> Stretching the personal endorsement to cover risks specifically insured
> under the property damage provisions would essentially render the
> pollution exclusion meaningless.

*City of Delray Beach v. Agricultural Inso. Co.*, 85 F.3d 1527,1535 (11th Cir. 1997); *see County*

*of Columbia*, 634 N.E.2d 946, 950 (N.Y. 1994) ("It would be illogical to conclude that the claims

fail because of the pollution exclusion while also concluding that the insurer wrote a personal

injury endorsement to cover the same eventuality."). It is clear that personal injury coverage for

pollution damage is not what was intended by Century and DCSB.

Additionally, inverse condemnation, nuisance and trespass are not equivalent to wrongful

entry or eviction within the meaning of this section. "Wrongful entry" or "eviction," require

some sort of impingement of the possessory rights of the residents neighboring the Site. *City of*

*Delray Beach*, 85 F.3d at 1534. When Section (2) of the Endorsement is read in light of the other

18

definitions of "personal injury" in Sections (1) and (3), it is implicit that the kind of injuries intended to be covered are not those which involve the migration of hazardous waste onto residential property. Moreover, unlike the general insurance policy, where coverage is broad and subject to defined exceptions, the Endorsement only affords coverage for specific risks. *Id.* at 1533-34.

DCSB's argument is a last ditch effort to find any sort of coverage for the *Williams* lawsuit. DCSB is correct that the Eleventh Circuit, in *City of Delray Beach,* concluded that a pollution exclusion in a similar policy did not apply to a personal injury endorsement. The endorsement must be applicable in order to be invoked to provide coverage. This Court will not distort the intentions of the parties and the plain language and structure of the Policy to shift liability onto the deeper-pockets of Century. *See County of Columbia*, 634 N.E.2d at 950. Therefore, as a matter of law, this Court finds that the Endorsement does not cover the environmental contamination in this case or any of the damages alleged as resulting therefrom.

Accordingly, it is **ORDERED and ADJUDGED:**

1. Century's Motion for Summary Judgment based on the Pollution Exclusion (Doc. No. 490) is **GRANTED.** Century had no duty to defend or indemnify DCSB from losses incurred as a result of the *Williams* Litigation.

3. The Clerk is directed to enter judgment in favor of Century on Counts IV and V of DCSB's Counterclaim (Doc. No. 161, p. 34-36), terminate all pending motions, and **CLOSE** the file.

**DONE AND ENTERED** at Jacksonville, Florida this _____ day of August, 2009.

19

HARVEY E. SCHLESINGER
United States District Judge

*Copies to:*
Efe Poturolgu, Esq.
H. Keith Thomerson, Esq.
John R. Gerstein, Esq.
Joseph T. Kissane, Esq.
Julie E. Nevis, Esq.
Ronald L. Kammer, Esq.
Colleen Ann Hoey, Esq.
Gabriela Richeimer, Esq.
Jeffrey M. Moody, Esq.
Laura E. Besvinick, Esq.
Meredith Werner, Esq.
Parker D. Thompson, Esq.
Rebecca L. Ross, Esq.
Richard J. Pratt, Esq.
Richard Kyle Gavin, Esq.
Rutledge Richardson Liles, Esq.
Virginia L. White-Mahaffey, Esq.
James E. Rocap, III, Esq.
Mark A. Black, Esq.
Brenton Neil Ver Plorg, Esq.
Charles Wayne Alford, Esq.
David D. Burnes, Esq.
Dwight E. Jefferson, Esq.
Grover G. Hankins, Esq.
Helen K. Michael, Esq.
John Sam Kalil, Esq.
Michael E. Tanner, Esq.
Ralph Knowles, Esq.
Robert F. Ruyak, Esq.
Robert E. Shields, Esq.
Robert H. Shulma, Esq.
Thomas Edward Bishop, Esq.
William T. Jacks, Esq.
Cindy A. Laquidara, Esq.
Derrel Quantill Chatmon, Esq.
Richard Hugh Lumpkin, Esq.
B. Thomas Whitefield, Esq.
Michael J. Baughman, Esq.
Eric William Neilsen, Esq.

John R. Beranek, Esq.
Major B. Harding, Esq.
Robert N. Clarke, Esq.
Jacob Sadler, Esq.
Michael F. Huber, Esq.
Stephen C. Ascher, Esq.